**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF WISCONSIN**

---

**TAMARA R. AUSTIN**,

Plaintiff,

Case No. ______________

v.

Hon. __________________

**ASCENSION, INC./ASCENSION HEALTH ALLIANCE**
**COLUMBIA ST. MARY'S INC./COLUMBIA ST. MARY'S HOSPITAL MILWAUKEE, INC.**
**ASCENSION HEALTH MINISTRY SERVICES**

Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, TAMARA R. AUSTIN, by her attorneys, LAW OFFICES OF JEAN M. ROBINSON, PLLC, alleges as follows against Defendant, ASCENSION, INC./ASCENSION HEALTH ALLIANCE/COLUMBIA ST. MARY'S INC./COLUMBIA ST. MARY'S HOSPITAL MILWAUKEE, INC./ASCENSION HEALTH MINISTRY SERVICES (Collectively, "Defendant"):

## NATURE OF THE ACTION

1. Defendant promoted Plaintiff, a Black woman, to Market Chief Operating Officer of its Wisconsin Market in January 2025. Six months later, and one week after her supervisor wrote that she had "done a great job," Defendant fired her "without cause," telling her she "had done nothing wrong." Defendant then gave her job to a white male Market Chief Operating Officer who was being displaced from an underperforming market that Defendant was divesting.

2. Weeks later, Defendant claimed it fired Plaintiff for poor performance. Defendant admits that no contemporaneous documentation supports that explanation. Plaintiff brings this action for intentional race and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and for intentional race discrimination under 42 U.S.C. § 1981.

## PARTIES

**3.** Plaintiff is a Black woman.

4. During her employment with Defendant, Plaintiff resided in Milwaukee County, Wisconsin.

5. Plaintiff was an "employee" of Defendant within the meaning of 42 U.S.C. § 2000e(f).

6. Plaintiff is a person within the jurisdiction of the United States within the meaning of 42 U.S.C. § 1981(a).

7. Defendant, ASCENSION INC./ASCENSION HEALTH ALLIANCE (also referred to as Ascension or Ascension Health) is an active nonprofit corporation organized under the

laws of Missouri, with its principal corporate headquarters located at 4600 Edmundson Road, St. Louis, MO 63134. Defendant, COLUMBIA ST. MARY'S INC./COLUMBIA ST. MARY’S HOSPITAL MILWAUKEE, INC. is a Wisconsin corporation with its principal office address located at 2323 N. Lake Drive, Milwaukee, WI 53211. Defendant, ASCENSION HEALTH MINISTRY SERVICES, as agent for Columbia St. Mary’s is an Indiana corporation registered under the name Ascension Health Ministry Service Center, LLC with its principal office located at 4040 Vincennes Circle, Indianapolis, IN 46268.

8. Defendants collectively operate in the Ascension Wisconsin Market, in Milwaukee County, Wisconsin.

9. At all times relevant, Defendant Ascension Inc./Ascension Health, Inc./ Ascension Health Alliance and Defendant Columbia St. Mary's Hospital Milwaukee, Inc./Ascension Health Ministry Services/ Columbia St Mary’s Inc. acted as a "single employer," "integrated enterprise," and/or "joint employers" of Plaintiff.

10. Defendant Ascension Inc./Ascension Health, Inc./ Ascension Health Alliance and Defendant Columbia St. Mary's Hospital Milwaukee, Inc. maintain, interrelated operations, including shared executive management, and interrelated human resource policies, practices and protocols.

11. Defendants maintain a centralized payroll framework and Plaintiff’s, Internal Revenue Service W-2 Form for tax Year 2024 names Ascension Health Ministry Services, Agent for Columbia St. Mary’s Inc. as Plaintiff’s employer. While Plaintiff’s W-2 Forms for Tax Year 2025 name both Ascension Health Alliance and Defendant Columbia St. Mary’s, Inc. as Plaintiff’s employer.

12. At all relevant times, Defendant had more than 500 employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

13. Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

14. Defendant is a nongovernmental entity subject to 42 U.S.C. § 1981(c).

15. Plaintiff's employment relationship with Defendant was a contract within the meaning of 42 U.S.C. § 1981(a) and (b). Under that relationship, she performed executive services in exchange for salary, merit increases, bonuses, and benefits.

## JURISDICTION AND VENUE

16. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4) and 42 U.S.C. § 2000e-5(f)(3).

17. Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practice alleged in this Complaint was committed in Wisconsin.

18. Venue is also proper in this District under 42 U.S.C. § 2000e-5(f)(3) because Plaintiff would have continued to work in this District if Defendant had not terminated her employment.

19. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims, including Defendant's termination of Plaintiff's employment, occurred in Milwaukee County, Wisconsin, which is within this District.

20. This action is properly filed in the Milwaukee Division because Defendant terminated Plaintiff's employment in Milwaukee County, Wisconsin.

## ADMINISTRATIVE PREREQUISITES AND TIMELINESS

21. On November 1, 2025, within 300 days after her June 9, 2025 termination, Plaintiff filed a sworn charge of discrimination with the EEOC, Charge No. 443-2026-00356 (the Charge"). 42 U.S.C. § 2000e-5(e)(1).

22. At the Plaintiff's request, the Charge was dual-filed with the Wisconsin Equal Rights Division as Case No. CR202503562.

23. The Charge alleged that Defendant terminated Plaintiff because of her race and sex, and it set out the facts alleged in this Complaint.

24. The EEOC issued Plaintiff a Notice of Right to Sue dated August 11, 2026.

25. A copy of the Notice of Right to Sue is attached as Exhibit 1.

26. Plaintiff filed this action within 90 days after receiving the Notice of Right to Sue. 42 U.S.C. § 2000e-5(f)(1).

27. All conditions precedent to Plaintiff's Title VII claims have been satisfied. Fed. R. Civ. P. 9(c).

28. Although not required to do so, Plaintiff also asserted her Section 1981 claim in her EEOC Charge.

29. Section 1981 does not require an administrative Charge before suit.

30. Plaintiff's Section 1981 claim is timely under 28 U.S.C. § 1658(a) because she filed it within four years after her June 9, 2025 termination.

## FACTUAL ALLEGATIONS

### A. The Wisconsin Market and Its Leadership

31. Defendant organizes its operations into geographic markets and regions, including the Wisconsin Market and a Michigan Market.

32. Each of Defendant's Markets is led by an Executive Leadership Team ("ELT").

33. The Wisconsin Market ELT included:

- Plaintiff; a Black Female
- the Chief Financial Officer (the "Wisconsin CFO"), a white male;
- the Chief Strategy Officer (the "Wisconsin CSO"), a white male; and
- the Chief Executive Officer (the "Supervisor"), a Black male, who led the ELT; and
- at least 8 other executives, most of whom were male.

34. Plaintiff was the only Black woman on the Wisconsin Market ELT.

35. Plaintiff and the other Wisconsin Market ELT members reported to the Supervisor.

36. The Supervisor reported to Defendant's Regional Chief Operating Officer (the "Regional COO").

37. The Regional COO is a white male.

38. The Regional COO oversaw both the Wisconsin Market and the Michigan market.

39. All Wisconsin Market ELT members are evaluated on an annual basis and subject to the same or similar executive performance evaluation standard and metrics.

40. The Wisconsin Market ELT members shared collective responsibility for the Wisconsin Market's financial and operational performance.

41. Defendant evaluated Wisconsin Market ELT members, in part, on the Wisconsin Market's financial performance.

42. When Plaintiff joined Defendant, the Wisconsin Market was severely underperforming financially.

43. Defendant had designated the Wisconsin Market as being in "recovery mode."

**B. Plaintiff's Performance as Market Administrator**

44. In January 2024, Defendant hired Plaintiff as Market Administrator of the Wisconsin Market.

45. Market Administrator was a senior executive position on the Wisconsin Market ELT.

46. As Market Administrator, Plaintiff restructured departments and reorganized operational reporting lines.

47. As Market Administrator, Plaintiff led the Wisconsin Market's Command Center in Defendant's response to a cyberattack.

48. In Plaintiff's fiscal year 2024 performance evaluation, the Supervisor wrote:

> "Tamara is doing a great job. During her six months with the Wisconsin Ministry, she has taken the appropriate steps to orient to all levels of the organization,

which includes the National Office, State Ministry, and the individual facilities. Tamara has reorganized departments and operational reports to drive improved operational performance. She led the Wisconsin Ministry Command Center in response to the cyberattack and is poised to drive operational optimization for FY 25."

49. Plaintiff's fiscal year 2024 evaluation reflected that she was meeting and exceeding Defendant's legitimate performance expectations.

50. Defendant nominated and selected Plaintiff for its Leadership Academy.

51. Defendant awarded Plaintiff an annual merit increase, in October 2024.

52. Defendant awarded Plaintiff year-end performance-based bonuses in September 2024 and July 2025, in consecutive years. The July 2025 bonus was awarded after Plaintiff's termination.

**C. Defendant Promoted Plaintiff to Market COO**

53. In January 2025, after she had served approximately twelve months as Market Administrator, Defendant promoted Plaintiff to Market Chief Operating Officer ("Market COO") of the Wisconsin Market.

54. Defendant promoted Plaintiff based on her exceptional job performance as Market Administrator.

55. When Plaintiff was promoted to Wisconsin Market COO her base annual salary was increased by approximately 21.95%.

56. As Market COO, Plaintiff remained on the Wisconsin Market ELT and continued to report to the Supervisor.

**D. The Wisconsin Market Improved Under Plaintiff's Leadership**

57. Plaintiff created and led a labor-expense reduction initiative for the Wisconsin Market.

58. That initiative reduced the Wisconsin Market's labor expense by more than $50 million year-over-year.

59. Under Plaintiff's leadership, the Wisconsin Market improved productivity, reduced its use of contract labor, and implemented standard policies, procedures, and processes.

60. During Plaintiff's tenure, the Wisconsin Market's financial performance improved by approximately $100 million.

61. When Defendant terminated Plaintiff, the Wisconsin Market was outperforming the prior fiscal year in both revenue and expense.

**E. One Week Before the Termination, the Supervisor Praised Plaintiff's Performance**

62. On or about June 3, 2025, approximately one week before Plaintiff's termination, the Supervisor delivered Plaintiff's fiscal year 2025 performance evaluation.

63. When delivering the evaluation, the Supervisor told Plaintiff she was doing a "great job."

64. In Plaintiff's fiscal year 2025 evaluation, the Supervisor wrote:

> "Tamara has done a great job leading change across the Wisconsin Ministry. She has brought a sense of order and organization to a set of circumstances characterized by extreme variability. She has been the catalyst for significant improvements in

productivity, reduced contract labor utilization, and implementation of standard policies, procedures and processes."

65. The fiscal year 2025 evaluation identified no deficiency in Plaintiff's performance.

66 Plaintiff's fiscal year 2025 evaluation reflected that she was meeting and exceeding Defendant's legitimate performance expectations.

67. Before her termination, Defendant never notified Plaintiff of any performance deficiency.

68. Before her termination, Defendant never warned or disciplined Plaintiff about her job performance.

69. Before her termination, Defendant never placed Plaintiff on a Performance Improvement Plan ("PIP").

70. Before her termination, Defendant never told Plaintiff that her employment was at risk.

**F. The Termination**

71. On June 9, 2025, Defendant terminated Plaintiff's employment.

72. The termination came approximately six months after Defendant promoted Plaintiff, and approximately one week after the Supervisor delivered her fiscal year 2025 evaluation.

73. The Supervisor informed Plaintiff of the termination at a meeting attended by the Interim Wisconsin Market Chief HR Executive, the Plaintiff and the Supervisor. (the "Termination Meeting").

74. At the Termination Meeting, Plaintiff asked why she was being terminated.

75. The Supervisor told Plaintiff that she "had done nothing wrong."

76. The Supervisor told Plaintiff that she was being "involuntarily terminated without cause."

77. No one at the Termination Meeting identified any deficiency in Plaintiff's performance.

78. At the Termination Meeting, the Supervisor told Plaintiff that her position would be filled within two weeks by an executive Market COO from the Company's Michigan Market.

79. Plaintiff's Replacement was a white male executive who was being displaced from the Michigan Market in connection with the Market's underperformance and divestiture.

80. Defendant gave Plaintiff no PIP, no corrective action, no warning, and no opportunity to transfer to a different position within the Company.

81. Upon information and belief, the Regional COO, directed Plaintiff's Supervisor to terminate Plaintiff's employment.

82. Upon information and belief, the Regional COO also made the decisions to reassign the Replacement (defined below) to Plaintiff's position and to retain the other Wisconsin Market ELT members.

**G. Defendant Retained and Reassigned the White Male Market COO**

83. Plaintiff's replacement (the "Replacement") is a white male.

84. Before his reassignment, the Replacement was Market COO of Defendant's Michigan Market.

85. The Replacement's Michigan position had the same title, role, and job description as Plaintiff's position.

86. As Market COO, the Replacement was responsible for improving the Michigan Market's performance.

87. The Replacement held the Michigan Market COO position for approximately two years.

88. The Regional COO supervised and oversaw the Replacement in the Michigan Market.

89. During the Replacement's two-year tenure, the Michigan market underperformed.

90. The Replacement did not turn around or improve the Michigan Market's performance.

91. Upon information and belief, the Regional COO knew that the Michigan market had underperformed under the Replacement's leadership.

92. Defendant displaced the Replacement from the Michigan market because of that market's underperformance and Defendant's divestiture of it.

93. Defendant did not terminate the Replacement.

94. Defendant relocated the Replacement and reassigned him to Plaintiff's position.

95. The Replacement formally assumed Plaintiff's position on or about July 1, 2025, approximately three weeks after her termination.

96. Upon information and belief, Defendant did not place the Replacement on a PIP or discipline him for the Michigan Market's underperformance.

97. Defendant's need to find a position for the Replacement arose at or about the same time Defendant decided to terminate Plaintiff.

**H. Defendant's Shifting Explanations**

98. On or about June 25, 2025, a few weeks after the Termination Meeting, Plaintiff requested her personnel file and all records relating to her termination.

99. In response, Defendant claimed for the first time that it had terminated Plaintiff for substandard job performance.

100. Defendant also claimed that it had lost confidence in Plaintiff's ability to "improve the performance of the Wisconsin market."

101. Defendant did not state either reason at the Termination Meeting.

102. Plaintiff asked Defendant for records supporting its new explanation.

103. Defendant admitted that it had no contemporaneous written or verbal documentation supporting its new substandard job performance explanation.

104. Defendant admitted that it could not articulate when, how, or why it lost confidence in Plaintiff.

105. Plaintiff's personnel file contains no warning, discipline, PIP, or below-expectations evaluation.

106. Defendant has not identified any document, created before June 9, 2025, that criticizes Plaintiff's performance.

**I. Defendant Treated Similarly Situated White and Male Executives More Favorably**

**(i) The Wisconsin Market ELT**

107. The Wisconsin CFO had direct responsibility for the Wisconsin Market's financial performance and turnaround.

108. The Wisconsin CSO had direct responsibility for the Wisconsin Market's strategic planning and financial turnaround.

109. Plaintiff, the Wisconsin CFO, and the Wisconsin CSO were members of the same ELT.

110. Plaintiff, the Wisconsin CFO, and the Wisconsin CSO reported to the same Supervisor.

111. Plaintiff, the Wisconsin CFO, and the Wisconsin CSO were subject to the same Leadership Team executive performance standards/policies.

112. Plaintiff, the Wisconsin CFO, and the Wisconsin CSO were accountable for the same market's performance.

113. The Wisconsin CFO and the Wisconsin CSO each bore at least as much responsibility as Plaintiff for the Wisconsin Market's financial performance.

114. Any underperformance by the Wisconsin Market occurred under the collective leadership of the Wisconsin Market ELT, including the Wisconsin CFO and the Wisconsin CSO.

115. Defendant did not terminate the Wisconsin CFO.

116. Defendant did not terminate the Wisconsin CSO.

117. Defendant did not discipline, place on a PIP, or downsize the Wisconsin CFO or the Wisconsin CSO because of the Wisconsin Market's performance.

118. Defendant retained every other member of the Wisconsin Market ELT, most of whom were males.

119. Plaintiff was the only member of the Wisconsin Market ELT whom Defendant terminated, disciplined, or held accountable for the Wisconsin Market's performance.

**(ii) The Replacement**

120. Plaintiff and the Replacement held the same title, role, and job description.

121. Plaintiff and the Replacement were each accountable for the performance of an underperforming market.

122. The Replacement's market did not improve under his leadership.

123. Plaintiff's market improved by approximately $100 million under her leadership.

124. Defendant retained the Replacement and reassigned him to a new executive position.

125. Defendant terminated Plaintiff without offering her any reassignment.

126. Defendant cites the ability to turn around a struggling market as the standard that justified terminating Plaintiff.

127. Defendant did not apply that standard to terminate the Replacement.

### (iii) Progressive Discipline Applied to White Male Executives

128. Defendant maintains human-resources policies and practices on discipline and termination, including corrective-action, remediation coaching practices and PIPs.

129. Upon information and belief, Defendant has regularly applied corrective action, remedial coaching, and PIPs to other white male executives before terminating them.

130. Defendant placed the Wisconsin Market's Director of Labor Management Engineering, a white male, on a Performance Improvement Plan ("PIP") before terminating his employment.

131. Defendant did not place the Plaintiff on a PIP or utilize any of its corrective action measures or policies to address Plaintiff's job performance before terminating her employment.

## J. Race and Sex Caused the Termination

132. Defendant needed to create a position for one displaced white male executive, the Replacement.

133. Defendant created that position by removing the only Black woman on the Wisconsin Market ELT.

134. Defendant chose Plaintiff for removal even though her market had improved under her leadership, as alleged in Paragraphs 57 through 61.

135. Defendant chose Plaintiff for removal even though the Replacement's market had not improved under his leadership.

136. Defendant chose Plaintiff for removal even though the white male Wisconsin CFO and Wisconsin CSO bore equal or greater responsibility for the Wisconsin Market's financial performance, which is the reason Defendant now gives for terminating Plaintiff.

137. Defendant "lost confidence" only in the Black woman who had measurably improved her market.

138. Defendant continued to show confidence in the white male executive who had not improved his market.

139. Had Plaintiff been a white man with the same performance record, Defendant would have retained her, as it retained the Wisconsin CFO and the Wisconsin CSO, or would have reassigned her, as it reassigned the Replacement.

**K. Discriminatory Motive**

140. Defendant's stated reasons for terminating Plaintiff are not its true reasons and are a pretext for race and sex discrimination.

141. Upon information and belief, Defendant maintains an equal employment opportunity policy and trains its executives and Human Resources personnel on federal anti-discrimination law.

142. Upon information and belief, those who made the decision to terminate Plaintiff knew that federal law prohibits terminating an employee because of race or sex.

143. Defendant acted intentionally and with malice or reckless indifference to Plaintiff's federally protected rights.

**L. Damages**

144. As a result of her termination, Plaintiff has lost wages, merit increases, bonuses, and benefits.

145. Plaintiff will continue to lose future earnings and benefits.

146. Plaintiff has suffered emotional distress, humiliation, and damage to her professional reputation.

## CLAIMS FOR RELIEF

### COUNT I – Intentional Race Discrimination (Title VII, 42 U.S.C. § 2000e-2(a)(1))

147. Plaintiff incorporates Paragraphs 1 through 146.

148. Plaintiff is Black. As alleged, she was meeting and exceeding Defendant's legitimate performance expectations.

149. As alleged, Defendant discharged Plaintiff, replaced her with a white employee, and treated similarly situated white executives more favorably.

150. As alleged, Defendant's stated reasons are pretextual. Defendant intentionally discharged Plaintiff because of her race, in violation of 42 U.S.C. § 2000e-2(a)(1).

151. In the alternative, race was a motivating factor in Defendant's decision to discharge Plaintiff. 42 U.S.C. § 2000e-2(m).

152. Plaintiff is entitled to relief under 42 U.S.C. § 2000e-5(g) and to compensatory and punitive damages under 42 U.S.C. § 1981a(a)(1) and (b).

**COUNT II – Intentional Sex Discrimination (Title VII, 42 U.S.C. § 2000e-2(a)(1))**

153. Plaintiff incorporates Paragraphs 1 through 146.

154. Plaintiff is female. As alleged, she was meeting and exceeding Defendant's legitimate performance expectations.

155. As alleged, Defendant discharged Plaintiff, replaced her with a male employee, and treated similarly situated male executives more favorably.

156. As alleged, Defendant's stated reasons are pretextual. Defendant intentionally discharged Plaintiff because of her sex, in violation of 42 U.S.C. § 2000e-2(a)(1).

157. In the alternative, sex was a motivating factor in Defendant's decision to discharge Plaintiff. 42 U.S.C. § 2000e-2(m).

158. Plaintiff is entitled to relief under 42 U.S.C. § 2000e-5(g) and to compensatory and punitive damages under 42 U.S.C. § 1981a(a)(1) and (b).

**COUNT III – Intentional Discrimination Because of Race and Sex in Combination (Title VII, 42 U.S.C. § 2000e-2(a)(1))**

159. Plaintiff incorporates Paragraphs 1 through 146.

160. Plaintiff is a Black woman. As alleged, she was meeting and exceeding Defendant's legitimate performance expectations.

161. Defendant discharged Plaintiff, the only Black woman on the Wisconsin Market ELT, while it retained or reassigned the white male executives described throughout this Complaint.

162. Defendant intentionally discharged Plaintiff because of her race and sex in combination, in violation of 42 U.S.C. § 2000e-2(a)(1).

163. Plaintiff is entitled to relief under 42 U.S.C. § 2000e-5(g) and 42 U.S.C. § 1981a(a)(1) and (b).

**COUNT IV – Intentional Race Discrimination (42 U.S.C. § 1981)**

164. Plaintiff incorporates Paragraphs 1 through 146.

165. Section 1981(a) provides that all persons within the jurisdiction of the United States "shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

166. Section 1981(b) defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

167. Section 1981(c) provides that these rights "are protected against impairment by nongovernmental discrimination." 42 U.S.C. § 1981(c).

168. Plaintiff is Black, a member of a racial minority protected by Section 1981.

169. Plaintiff and Defendant were parties to a contractual relationship under which Plaintiff performed executive services for Defendant in exchange for salary, merit increases, bonuses, and benefits.

170. That relationship was a contract within the meaning of Section 1981, even though either party could end it at will.

171. On June 9, 2025, Defendant terminated that contract. Termination of a contract is an activity protected by 42 U.S.C. § 1981(b).

172. As alleged, Defendant intentionally discriminated against Plaintiff because of her race.

173. Race was a but-for cause of Plaintiff's termination. When the Regional COO needed a position for the displaced white male Replacement, Defendant retained every white member of the Wisconsin Market ELT. But for her race, Plaintiff would not have been the executive selected for termination.

174. As alleged, had Plaintiff been white, Defendant would have retained her, as it retained the Wisconsin CFO and the Wisconsin CSO, or would have reassigned her, as it reassigned the Replacement.

175. For this Count, Plaintiff alleges that race was the but-for cause of her termination. She does not rely on the motivating-factor standard of 42 U.S.C. § 2000e-2(m), and she does not assert sex discrimination under Section 1981.

176. Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights.

177. Plaintiff is entitled to compensatory and punitive damages under 42 U.S.C. § 1981, and to attorney's fees under 42 U.S.C. § 1988(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendant, and award:

(a) A declaration that Defendant violated Title VII and 42 U.S.C. § 1981;

(b) Back pay, lost merit increases, lost bonuses, and lost benefits, with prejudgment interest;

(c) Reinstatement to Plaintiff's former position or a substantially equivalent position, or front pay in lieu of reinstatement;

(d) Compensatory damages under 42 U.S.C. § 1981a(a)(1) and 42 U.S.C. § 1981;

(e) Punitive damages under 42 U.S.C. § 1981a(b)(1) and 42 U.S.C. § 1981;

(f.) Reasonable attorney's fees, expert fees, and costs under 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988(b);

(g) Post-judgment interest under 28 U.S.C. § 1961; and

(h) All other relief the Court deems just and proper.

## JURY DEMAND

Under Fed. R. Civ. P. 38(b) and 42 U.S.C. § 1981a(c), Plaintiff demands a trial by jury on all issues so triable.

Dated this 9th day of November, 2026.



s/ Jean M. Robinson
State Bar Number: 1010880
Attorney for Plaintiff
Law Offices of Jean M. Robinson PLLC
9303 Elk Horn Road
Lorton, VA 22079
Telephone: (202) 999-6439
E-mail: JeanEsq1@aol.com

# Exhibit 1:

EEOC Notice of Right to Sue Letter dated August 11, 2026